## CRIMINAL PROSECUTIONS UNDER THE STATE BANKING LAW.

Common Pleas Court of Huron County.

STATE OF OHIO V. JAMES G. GIBBS AND JAY F. LANING.

Decided, August 17, 1908.

*Criminal Law—Indictment Charging Officers of a State Bank with Embezzlement of Bank Funds—Penal Section of the Free Banking Act not Applicable to Banks not Organized under that Act—Section 3821-85—Review of Bank Legislation in Ohio.*

Section 30 of the act entitled "An act to authorize free banking," passed March 21, 1851, and amended in 76 O. L., 72, enumerating and defining certain acts of officers and others "of any banking company," as penal, although worded in general language is limited in its operation to banks organized under that act.

*L. W. Wickham* and *S. M. Young*, for plaintiff.
*A. V. Andrews, Horace Andrews, A. M. Beattie, C. L. Kennan, J. J. Sullivan* and *W. M. Koons*, for defendants.

DOYLE, J.

Heard on demurrers to indictment.

The indictment in this case purports to charge a crime under Section 30 of "An act to authorize free banking," passed March 21, 1851 (49 O. L., 41), as amended April 24, 1879 (76 O. L., 72, 74). It was so recognized by counsel in the argument of the issues in this case, and is apparent from the fact that no general criminal statute applying to banking institutions provides penalties for the acts complained of in this indictment, under which this indictment can be brought.

Before discussing any other objections to the indictment it should first be determined whether the provisions of Section 30, as amended 76 O. L., 72, are applicable to the defendants. If they are not, then no crime is charged against these defendants.

The indictment charges that the accused, being respectively president and vice-president and both directors of the Ohio Trust Company, with intent to injure and defraud, unlawfully did ab-

stract and willfully misapply certain funds and credits of said the Ohio Trust Company, by unlawfully, willfully and not for any use, benefit, gain or advantage of said the Ohio Trust Company; converting, applying and conveying said funds and credits to the use, benefit, control, gain and advantage of certain persons·unknown to the grand jury.

Section 30 of the act in question as amended (R. S., 3821-85), reads as follows:

"Every president, director, cashier, teller, clerk, or agent of any banking company, who shall embezzle, abstract, or willfully misapply any of the moneys, funds, or credits of such company, or shall, without authority from the directors, issue or put forth any certificate of deposit, draw any order or bill of exchange, make any acceptance, assign any notes, bonds, drafts or bills of exchange, mortgage, judgment or decree, or shall make any false entry in any book, report, or statement of the company, with the intent in either case to injure or defraud the company, or any other company, body politic or corporate, or any individual person, or to deceive any officer of the company, or any agent appointed to inspect the affairs of any banking company in this state, shall be guilty of an offense, and, upon conviction thereof, shall be confined in the penitentiary, at hard labor, not less than one year nor more than ten years."

It was put in this form April 24, 1879 (76 O. L., 74). The section as originally enacted read as follows (49 O. L., 41):

"Every president, director, cashier, teller, clerk or agent of any banking company, who shall embezzle, abstract, or willfully misapply any of the moneys, funds, or credits of such company, or shall, without authority from the directors, issue or put in circulation any of the notes of such company, or shall put in circulation any bills or notes purporting to be the circulating bills or notes of such bank, other than those delivered to such bank by the auditor of state, as provided for by this act, either with or without the authority of the directors; or shall, without such authority, issue or put forth any certificate of deposit, draw any order or bill of exchange, make any acceptance, assign any note, bond, draft, bill of exchange, mortgage, judgment or decree, or shall make any false entry on any book, report or statement of the company, with an intent in either case to injure or defraud such company, or to injure or defraud any other company, body corporate or politic, or any individual person, or to

deceive any officer or agent appointed to inspect the affairs of any banking company in the state, shall be guilty of a misdemeanor, and upon conviction thereof, shall be confined in the penitentiary at hard labor, not less than five nor more than ten years.''

The indictment does not show nor is it claimed that the Ohio Trust Company was organized under the act of March 21, 1851 (49 O. L., 41).

If the provisions of Section 30 above noted only apply to banks organized under the provisions of that act, then this indictment does not charge facts constituting a crime.

During the early history of our state it was regarded that the principal privilege of a bank was to issue and put in circulation notes which were designed to circulate as currency. This became a great evil and was met by the act of February 8, 1815 (13 O. L., 152; 2 Chase, 868), which prohibited individuals and companies of individuals from issuing bank notes unless the individual be specially authorized or the company incorporated for that purpose, but these acts did not prevent companies and individuals from receiving deposits, discounting exchange, loaning money and dealing in commercial paper and doing other things which are regarded as a legitimate function of banking institutions today. Again on January 27, 1816 (36 O. L., 101; Swan, 136), by an act to prohibit unauthorized bank paper, and the exercise of banking powers, except by ''banks incorporated by a law of this state.''

From that time until 1845 many special laws were passed incorporating companies to do a banking business, in which the powers, restrictions, manner of organization, manner of conducting business, obligations and duration of franchise of each of them were set forth. 3 Chase, 2019-2083.

March 7, 1842 (40 O. L., 39), an act was passed which provided regulations to apply to banks thereafter incorporated and was amended February 21, 1843 (41 O. L., 36), by incorporating several new banks and making them subject to these regulations. These restrictions not being agreeable to some of the banks which had come in under its provisions, several of them were by act of February 15, 1844 (42 O. L., 19), restored to their original charters.

These banks thus authorized by those several acts or charters issued currency based upon the credit and assets of the respective companies. These franchises were eagerly sought and companies ostensibly chartered for other purposes attempted to so have their powers construed as to permit them to do banking. Legislators carefully scrutinized bills granting charters, to ascertain if lurking within the powers granted were any that could be construed into an authority to do banking. Along with many other reported cases attention is called to those reported for the December term, 1841, of our Supreme Court—*State* v. *Alexandrian Soc.*, 11 Ohio, 1; *Lougee* v. *State*, 11 Ohio, 68; *Bonsal* v. *State*, 11 Ohio, 73; *Steedman* v. *State*, 11 Ohio, 82; *State* v. *Library Co.*, 11 Ohio, 96; and *State* v. *Exporting Co.*, 11 Ohio, 126, as interesting fragments of the history of banking in Ohio during that period, and as throwing light on the causes which induced and circumstances surounding subsequent legislation on banks and banking.

Finally to meet the demand for safe banks and for a better currency and to give the business the benefits and sanction of a state supervision over it the act of February 24, 1845 (43 O. L., 24; Curwen, 1089; S. & C., 117), was passed which provided for incorporating the State Bank and other banking companies. The report of the bank commissioners, July 26, 1842, shows the the necessity. The year 1841 and commencement of 1842 were marked by the failure of about one-third of the banks of Ohio.

This act provided in detail for the organization, management, powers, privileges and liabilities of such banks and for a currency to be issued by them based upon securities deposited with the treasurer of state to the amount of their circulation, by the independent banks therein provided for and to the amount of 10 per cent. of their circulation by the branches of the State Bank.

The duration of the franchises to be exercised under the provisions of this act was limited to about twenty-one years, the franchises expiring May 1, 1866. Act 43 O. L., 24, Sections 16 and 51.

The provisions of the act pertained solely to the banks organized under its provisions, except where other banks were par-

ticularly mentioned and except that the last section provided as follows:

"Provided, further, that nothing contained in this act shall be so construed as to permit any of the banks of this state to issue notes of a less denomination than five dollars, except such banks as shall accept of and comply with the provisions of this act."

This proviso was inserted as a precaution against banks not doing business under this act from claiming the right to issue currency in bills of less denomination than five dollars, they being prohibited from so doing by Section 1 of an act passed March 23, 1840 (38 O. L., 117; Swan, 141), amending the act of January 27, 1816 (36 O. L., 101).

The state bank act was repealed May 21, 1894 (91 O. L., 396).

By the act of March 21, 1851 (49 O. L., 41; S. & C., 168), another kind of bank was provided for by "An act to authorize free banking," in which is contained the penal Section 30 under which the indictment in this case is drawn. This act, like the State Bank act, provided a scheme of organization, management, powers, privileges and liabilities and for a currency to be issued by banks incorporated pursuant to its provisions.

This act in the main followed the provisions of the State Bank act except in certain details, and, in some parts, is an identical transcript therefrom.

The duration of the franchises of these banking companies was twenty-one years, expiring in 1872 (49 O. L., 41, Section 10), with a further provision that the corporate existence of the company should exist thereafter until the repeal of the act. This was for the purpose of enabling the companies to wind up their business and nothing more, because Section 42 provided that nothing in the act should be construed so as to authorize a continuance of banking business, under the act, after 1872.

The new Constitution had been adopted eleven days before this act was passed and provided that "the General Assembly shall pass no special act conferring corporate powers" (Article XIII, Section 1). It was thereafter out of the power of the Legislature to charter banking companies in the old way by special act.

The entire banking system of the state had been bitterly as-

sailed in the constitutional convention because from it had emanated the paper currency to which was attributed a great amount of the financial troubles through which the people had passed, and an effort was made to have inserted in the Constitution a provision to deny to the General Assembly power to create banking institutions or to authorize the issuing of paper currency. The majority of the committee on banks and currency reported that "the business of loaning and dealing in money shall be left free to all," and reported also against any special privileges and against paper currency. 1 Debates Ohio Convention, 708.

Another result of the agitation against banks of issue and special privileges was the adoption of Article XIII, Section 7, which provided that no act of the General Assembly authorizing associations with banking powers should take effect until it should be submitted to the people at the next election after it passage, and be approved by a majority vote. Interpreted according to the generally accepted and understood meaning of the term at that time "associations with banking powers" meant banks of issue. *Dearborn* v. *Bank*, 42 Ohio St., 617.

Here then was another obstacle to those who favored the old system of banks of issue. With the feeling throughout the state which prevailed against these institutions and which was an active factor in the choosing of delegates to the convention and was exhibited in the proceedings of that body, it would have been very difficult after the Constitution went into effect to have gotten the people to approve any act of the General Assembly authorizing associations with banking power.

The convention met May 6, 1850. On May 14 a resolution was introduced to inquire into the expediency of preventing the Legislature from granting special charters for banking purposes and against the issuing of currency. The report of the committee on banks and currency was made July 5. The friends of the old system had fair warning of its impending doom. The franchises of the banks organized under the state bank act expired in 1866 and the only hope of prolonging the system was the enactment of another law providing for banks of issue before

the new Constitution went into effect. The free banking act, though passed eleven days after the adoption of the Constitution by the convention, would by virtue of Section 1 of the schedule remain in force and thus extend the privileges of this system of banking for twenty-one years.

The free banking act does not bear any of the *indicia* of the reforms demanded at that time in the banking system and its provisions are only applicable to the banks incorporated under it. It differs not at all in this respect from the state bank law. They are general laws but their provisions are limited to the subjects created by them. There is not a complete provision in either of them that can be taken as a general rule for subjects besides those arising out of the law itself. They show for themselves that they were not designed as general laws to regulate any banking except the banking authorized by their provisions and that banking could only be engaged in by those persons, conforming to their provisions, hence none of their provisions can be made applicable to persons engaged in banking not organized and carried on under these acts. Neither in the titles of the acts nor by any express language contained in them do they purport to apply to any other banks than those incorporated under them.

It is claimed that the court must imply from the general language used in the introduction of some of the sections of these acts, that they are to apply to all banks whether incorporated under these acts or otherwise.

Section 2 of the free banking act (49 O. L., 41; Rev. Stat., 3821-65), in the things required preliminary to forming a banking company, does not contain a single allusion in express terms to forming a company under this act, yet it would not be reasonable to say that it was not part and parcel of the scheme for organizing a bank under this act.

Section 11 of the same act (Rev. Stat., 3821-70), provides that, "the capital stock of every company shall be divided into shares of $50 each," etc., but does not say nor contain within it anything from which to directly draw a conclusion that it applies to free banking companies, yet, no one would hesitate to declare that it only applies to companies organized under the act,

If it can be construed to apply to other banking companies, the term "every company" is broad enough to make it apply to every company whether banking or not, and a perusal of its provisions will show that the Legislature did not intend under the guise of a banking law to introduce such a provision into the corporation law of the state. About the same results are reached in attempting to make the provisions of other sections containing only general words, apply to other banks.

The same applies to the state bank act (43 O. L., 24). In both acts there is shown on the part of the draftsman of the acts a free use of general terms in sections where it is evident that banks incorporated under these acts alone were referred to.

In most cases the phrases "authorized by this act," "granted by this act," "under the authority of this act," "by this act specially authorized," "any such independent banking company," "under the provisions of this act," "organized under this act," etc., and terms of like import are used in sections interspersed among sections using general terms in the state bank act, and in the same manner in the *free banking act* are found expressions like "hereby authorized," "herein authorized," "formed under this act," "under the provisions of this act," "which shall have availed itself of any of the privileges granted by this act," used in sections throughout the act interspersed with sections containing only general words to denote to whom their provisions apply.

To put any other construction upon the sections containing the general terms than that they apply solely to the banks organized under these acts respectively would do violence to their meaning. Take the sections containing these general terms and apply them to the then existing companies or to present companies and note the confusion made by the contradictory provisions of these sections and the charters and laws under which these other companies were organized.

If the provisions of the sections containing these general words in the state bank act were to apply to all banking companies, then why re-enact the same provisions in the free banking act? The Legislature evidently did not regard them as ap-

plicable to other banks because they were re-enacted in the latter law, which was entirely unnecessary if the construction asked for is correct.

If the sections of the free banking act containing general terms were to have universal application, why duplicate laws on the same subject? If such were the intention of the General Assembly, it would have repealed those general provisions of the state banking act.

If the contention of the state be correct, it was possible for the General Assembly at that time under any title, by any act purporting to be for some certain definite purpose, to amend other laws or enact new laws by the use of general words in some of the sections of the act and affect persons and things to which the title and purpose of the act were not at all germane. This would be a most dangerous innovation in legislation and it will not be presumed that the General Assembly of Ohio did it in these instances.

Looking at the two acts, each as a whole, taking into consideration the history of the banking business and the legislation thereon, and that this bank legislation was the outgrowth of the special charter system of earlier times, the conclusion is evident that they provided general charters of two different kinds. Instead of special charters for each company these acts provided two kinds of charters, either of which could be chosen. These acts ran in parallel lines and the institutions formed under them were co-existent and each had a code of regulations, restrictions, privileges and penalties unto itself.

Neither of the acts show that they were designed for the regulation of banking generally. The titles and the context of each negative that construction. No demonstration, beyond profert of the acts themselves beside of acts which were passed for general regulation of all banking institutions, need be made to make that apparent. There were in existence statutes affecting banking concerns generally from an early date. Besides those already mentioned there was the act of February 25, 1839 (37 O. L., 30; Swan, 126), for the appointment of a board of bank commissioners "and for the regulation of banks within the state of Ohio," and its amendment of March 23, 1840 (38 O.

L., 117; Swan, 132). Then the amendments to the act of January 27, 1816 (36 O. L., 101; Swan, 136), as follows: February 16, 1858 (36 O. L., 16; Swan, 139); March 18, 1839 (37 O. L., 75; Swan, 140); and March 23, 1840 (38 O. L., 117; Swan, 141). Then there was the act to keep out banks from other jurisdictions passed January 9, 1839 (37 O. L., 10; Swan, 145), and the act regulating judicial proceedings where banks were parties, January 28, 1824 (29 O. L., 453; Swan, 147). An act was passed to restrain banks from taking usury March 19, 1850 (48 O. L., 35; S. & C., 149), and more acts on the subject of unauthorized bank paper, March 12, 1845 (43 O. L., 121; S. & C., 152), and January 22, 1846 (44 O. L., 13; S. & C., 154). In addition to these general acts there were others passed both before and a short time after the free banking act showing that the General Assembly had been providing regulations for all such institutions generally by direct acts, and not by grafting general regulations upon acts designed for the forming and regulating of special corporate bodies.

Neither of these acts have been regarded by the bar nor the annotators of our statutes as operative upon companies other than those incorporated under them. Swan and Critchfield, who compiled the laws of Ohio which were published and distributed to officers of the state under act March 16, 1860, designated them as obsolete. *Citizens Sav. Bank* v. *Ide*, 20 C. C., 665.

The commission to codify the laws of the state appointed pursuant to act of March 27, 1875 (72 O. L., 87), and whose codified laws were passed by the General Assembly June 20, 1879, and are known as the Revised Statutes of 1880, omitted both of the laws from the codification, and simply appended them to the report as laws unrepealed and in force. They did not consider them of any general force outside of the companies therein created, or the so-called general features of the laws would have been incorporated into the code.

The duration of the franchises provided for in these acts, one set expiring in 1866 and the other in 1872, shows the temporary character of the acts and is another indication that they were not designed for universal application. This temporary character is recognized again by the General Assembly on March 15,

1875, by an act pertaining to the winding up of the affairs of these banks. 72 O. L., 55.

In *Franklin Bank* v. *Bank,* 36 Ohio St., 350, it was conceded that the corporate existence of these banks organized under the free banking act ceased on the first day of January, 1873, except for the purposes of winding up their affairs.

Since the inauguration of the national banking system these acts have been generally regarded as obsolete and with the system of banking which they represented were generally abandoned. The General Assembly has provided a state banking system without regard to them, by various enactments. Without the aid of the judicial tribunals these acts have been generally construed and that construction has been acted upon, and that common sense construction has been correct and will bear the test of the rules of the courts.

With the construction given, the manifest reason and intention of the law has prevailed, and that without being at variance with the literal import of the language employed, although such variance could have been ignored if necessary. *Slater* v. *Cave,* 3 Ohio St., 80, 82.

And the intention of the law makers has been collected from the causes of the law, its scope, its object, its language, its purposes expressed in its title and context and the manifest incentive for their enactment as evidenced by the circumstances attending its passage, all harmonizing. *State* v. *Buchanan,* Wright, 233; *Wilber* v. *Paine,* 1 Ohio, 251, 256; *Burgett* v. *Burgett,* 1 Ohio, 469, 480; *Steamboat Monarch* v. *Finley,* 10 Ohio, 384, 387; *Johnson* v. *State,* 42 Ohio St., 207, 210; *Stone* v. *Elliott,* 11 Ohio St., 252, 258; *State* v. *Harmon,* 31 Ohio St., 250, 264; *Brigel* v. *Starbuck,* 34 Ohio St., 280, 285; *Terrill* v. *Auchauer,* 14 Ohio St., 80; *Board of Education* v. *Board of Education,* 46 Ohio St., 595; *State* v. *Alexandrian Soc.,* 11 Ohio, 1, 11; *Sawyer* v. *State,* 45 Ohio St., 343; *Steamboat Messenger* v. *Pressler,* 13 Ohio St., 255, 262; *Schooner Aurora Borealis* v. *Dobbie,* 17 Ohio, 125; *Thompson* v. *Steamboat J. D. Morton,* 2 Ohio St., 26; *Steamboat Ohio* v. *Stunt,* 10 Ohio St., 582; Broom's Legal Maxims (7 Eng. Ed.), 425; Black, Interp. of Laws, 110, 224, 212, 204, 196; *Rockfield* v. *Bank,* 77 O. S., 311,

329; *White-Smith Music Pub. Co.* v. *Apollo Co.,* 209 U. S., 1, Advance Sheets Sup. Ct., Oct. Term, 1907, pp. 319, 322.

In construing this act every part of it should be considered in order to collect from the whole one uniform and consistent sense; the construction must be made upon the whole act, and not from disjointed parts; and the whole context considered although the immediate object of inquiry may be the meaning of one particular section or other isolated part. *Coles* v. *Holme,* 8 Barn. & Cr., 568; 32 R. R., 486; Hobart, 275; *Gale* v. *Reed,* 8 East, 79; 9 R. R., 376; *Manuel* v. *Manuel,* 13 O. S., 458, 465.

In *Board of Education* v. *Board of Education,* 46 Ohio St., 595, the court rejected the letter of the law, where the use of the words "all" and "any" had made the statute sound general, and limited the meaning of such general words to the object to which it was apparent the Legislature intended to apply them.

Section 30 of the free banking act, the special construction of which is in controversy in this case, is affected by the general construction of the act. This section, however, alone pretty effectually demonstrates that the act does not apply outside of the companies formed under the act.

The section begins with this general language: "*Every* president, * * * of *any banking company.*" This sounds very general and invites an inquiry as to what banking company. The section itself answers that *quaere.* In the enumeration of the acts forbidden occurs this language (49 O. L., 41): "Or shall put in circulation any bills or notes purporting to be the circulating bills or notes of *such bank,* other than those delivered to *such bank* by the *auditor of state, as provided for by this act.*" This plainly identifies the kind of bank of which the accused must be president. The act provides for the delivering by the Auditor of State of circulating bills and notes only to banks formed pursuant to its provisions. This clearly demonstrates that before the officer mentioned in the act can be amenable to the penal provisions of this section he must be "president, director, cashier, teller, clerk, or agent", of a bank incorporated under the free banking act. Having thus fixed the character of the banking institution, every other allusion to "such bank" in this section, as examination will show, is to

the bank of which the person accused is such officer and that is a free bank.

If the Legislature had intended this penal section to be universal in its application to officers of banking companies, it would have been the proper and natural thing to do to have put it in the code of criminal laws, or attached it to some of the laws for regulating banks generally to which reference has already been made.

It has not been recognized by authors and editors of works on criminal law in Ohio, except in one instance, as belonging to the criminal laws of general application. Neither Warren nor Wilson, who began the publication of text books on the criminal laws of Ohio a great many years ago, recognized it.

The codifying commission did not place it in the criminal code nor recognize it as effective outside of the act in which it was contained. The code was passed June 20, 1879, and on April 24, 1879, at the same session, Section 30 had been amended by which the clause above recited with reference to putting in circulation bills or notes of the bank had been eliminated. This change leaves the section, when standing alone, sounding very much as a general law of universal application but nevertheless it was not put in the criminal code.

This section was so amended April 4, 1879 (76 O. L., 72, 74), by an act "Further to amend the act entitled an act to authorize free banking, passed March 21, 1851 (49 O. L., 41), and the acts amendatory and supplementary thereto." This act amended six and repealed twenty sections of the free banking act. Nothing in this act indicated that the Legislature intended to extend the scope of the law. It simply cut out of the act matter that was of no importance at that time in winding up the affairs of such free banks as had not yet had their affairs closed. It was recognized by the Legislature as a part of the old act and as such amended and left as a part of the old banking law.

Its construction remains the same so far as the persons and things to which its provisions apply. *Ebersole* v. *Schiller,* 50 Ohio St., 701.

As a part of the act of March 21, 1851 (49 O. L., 41), it applied only to officers of the banks therein provided for and that

act was complete within itself and no amendment of a section of the act can change its character so as to make it applicable to other persons, unless there be some expression of such legislative intent in the act making the amendment, either in the title or the context.

What the Legislature has omitted to include within the express provisions of a penal law, reasonably construed, the court can not supply. Whatever the object of this amendment, there has been no legislative expression other than to amend the old law and eliminate one of the offenses of the penal section thereof. *State* v. *Finch*, 37 Minn., 433; Black on Interpretation of Laws, 110.

Our last General Assembly on May 1, 1908 (99 O. L., 269), passed an act relating to the organization of banks and inspection thereof, and placed therein a penal section (Section 44), similar to Section 30 of the free banking act. Section 30 was not repealed nor was it mentioned. Section 35 of the new act saves to all banks the rights, privileges and powers heretofore conferred upon them by the acts under which they were incorporated, until pursuant to Section 36 they shall after April 1, 1910, conform their business to the provisions of this act and become subject thereto as provided in Section 91.

If Section 30 had been considered operative generally, it would seem that the General Assembly would have repealed it. Even as amended it was ignored.

The state bank act and its amendments and supplements were repealed, but the free banking act was left unrepealed.

The committees and other members of the General Assembly who had this bill in charge must certainly have been familiar with Section 30 and other parts of the act. It is a matter of history that the bill of May 1 was the result of a great amount of public discussion during the past years and was prepared with much care, criticism and discussion. Some of the best talent of the state took part in the preparation of the law and in discussing and criticising it, and it is fair to presume that the commonly recognized construction of Section 30 was accepted and acted upon. 209 U. S., 1; 77 O. S., 311, 329.

Section 30 being a penal statute must be strictly construed,

and can not be extended, by implication, to cases not falling within its terms. This is a rule so familiar that it needs no authority to sustain it, but to illustrate the rule reference is made to the decision of Judge Ranney in *Hall* v. *State*, 20 Ohio, 7. In this case it was by statute made an offense to sell liquor within three miles of any iron furnace, forge or foundry, used for the manufacturing pig iron, etc., within certain counties. The accused was in business at the time the act was passed in one of these counties, but not within three miles of any iron furnace or foundry. Subsequently one was erected within three miles of his place. Judge Ranney in giving the opinion of the court said, page 16:

"A statute referring to or affecting persons, places, or things, is limited in its operations, to persons, places, or things, as they existed at the time the statute was passed."

In *United States* v. *Paul*, 31 U. S. (6 Pet.), 141, accused was prosecuted for burglary under a statute of the United States which provided that if an offense, for the punishment of which there was no federal statute, were committed in any land ceded to the United States for forts, etc., the accused was to receive the same punishment that the state law provided. When the act was passed burglary was not a crime in that state (New York), though subsequently it was made one, and prior to the offense of the accused. Held by Supreme Court of the United States that the prosecution was confined to the laws of that state as they existed at the time the act of Congress was passed, and accused was not guilty.

In the case of *State* v. *Meyers*, 56 Ohio St., 340, this syllabus was made:

"A statute defining a crime or offense can not be extended, by construction, to persons or things not within its descriptive terms, though they appear to be within the reason and spirit of the statute."

A deputy county treasurer was indicted for embezzling county money. Section 6841, Revised Statutes, was restricted to a person "charged with the collection, * * * of the public money." *Held*: That this was restricted to persons charged by law with that duty and the deputy did not come within its terms.

In a case where a statute provided a penalty for betting on an election it was held not to apply to a primary election. *Commonwealth* v. *Wells*, 110 Pa. St., 463.

Even if the question were doubtful it would be the duty of the court to construe such criminal statute in favor of the accused.

In *Winnett* v. *State*, 18 C. C., 515, the court say:

"In criminal cases where the liberty of an individual is at stake, and there exists in the mind of the court a reasonable doubt as to the criminal liability of the accused, it is the duty of the court to resolve the doubt in his favor. In this case, in the light of the authorities and under the circumstances, we can not do otherwise than hold that the indictment under which the plaintiff in error was convicted was insufficient, and the demurrer should have been sustained, and in overruling the demurrer the court of common pleas erred, and that the judgment should be reversed."

That the rule of strict construction in criminal matters is jealously guarded, see Section 4948, Revised Statutes, where for fear that the liberal construction in civil matters therein provided may be taken for a license to extend the same to matters of a penal nature, it is expressly provided:

"But this section shall not be so construed as to require a liberal construction of provisions affecting personal liberty, relating to amercement, or of a *penal nature.*"

"A court can not create a penalty by construction, but must avoid it by construction, unless it is brought within the letter and the necessary meaning of the act creating it.

"And where a statute may be so construed as to give a penalty, and also and as well so as to withhold the penalty, it will be given the latter construction." Black, Interp. of Laws, 287.

If there be any reasonable doubt as to whether the offense mentioned in Section 30 of the free banking act, if done by an officer of another kind of bank, be an offense punishable by law, that doubt should be resolved in favor of the accused. No man should be guessed or construed into prison.

The demurrers to the indictment are sustained and the defendants are discharged.